WHITE BEAR, APPELLANT, v. BARTH ET AL., RESPONDENTS.

(No. 4,535.)

(Submitted October 27, 1921. Decided November 21, 1921.)

[203 Pac. 517.]

*Contracts—Invalidity—Public Policy—Corrupt Use of Money —Personal Influence Over Indians.*

Indians—Grazing Contracts—When not Subject to Review.
  1. Under the Act of Congress approved February 28, 1891 (26 Stats. at Large, 795), Tribal Indians are given primary authority to lease lands owned by them for grazing purposes, the determination of their council being conclusive upon the federal government in the absence of evidence of fraud or undue influence.
Contracts—Indians—Grazing Contracts—Corrupt Use of Money—Invalidity—Public Policy.
  2. A contract between an Indian and livestock men, under which the former agreed by the corrupt use of money to influence the members of his tribe toward preventing a certain person from receiving a lease of their lands for grazing purposes; to incite them to demanding the cancellation of other leases, without reference to the merits of the case and upon unverified statements of his employers; to prevent the cancellation of a lease to one of the latter in face of the fact that the government had just cause for canceling it, and to keep him on the reservaton in defiance of an order canceling his lease and directing his removal, *etc.*, was void as against public

---

2. When contract void because for services forbidden by public policy, see note in 66 Am. Dec. 505.

Validity of contract which contemplates the violation of a contract with a third person, see note in 11 A. L. R. 706.

policy, it being immaterial that the resulting action by the Indians may not have led to injury or may have been for the best interest of the Indians.

Same—Grazing Contracts—Personal Influence Over Indians—Invalidity—Public Policy.

3. A contract under which an Indian—who was a grandson of a former chief of his tribe and had been educated at Carlisle, who acted as interpreter for the Indians, was a regular attendant at their council meetings, prominent in tribal affairs and had great influence with them, being generally successful in having his views adopted even against pronounced opposition, was to exercise his personal influence with the Indians to obtain action favorable to his employers in the matter of leases of land for grazing, was void as against good morals and sound public policy.

*Appeals from District Court, Yellowstone County; Chas. A. Taylor, Judge.*

ACTION by Russell White Bear against Anna Barth, executrix of the estate of A. H. Barth, deceased, and Charles McDaniels. From a judgment for defendants, and from an order denying his motion for a new trial, plaintiff appeals. Affirmed.

*Mr. E. E. Enterline* and *Messrs. Reynolds & Shea,* for Appellant, submitted a brief, and one in reply to that of Respondents Barth; *Mr. Enterline* argued the cause orally.

Contracts which do not involve personal solicitation and influence to the extent of seeking to bring pressure to bear upon legislative or departmental action and which only seek to procure and present in a fair and candid way the facts for such legislative and departmental action are valid. (2 Elliott on Contracts, secs. 1040, 1046, 1049, 1050; 8 *Id.,* sec. 1046; 6 R. C. L., secs. 137–139.)

In a case considered by the supreme court of California, the defendant had a claim pending before the secretary of interior for timber-land entries. The matter had been long delayed in the land department, whereupon the defendant employed plaintiff as an attorney for the purpose of having said

3. Validity of contract to influence, by apparently disinterested advice, the conduct of a third person to whom the promisor owes no contractual duty, see note in L. R. A. 1917F, 468.

entries ratified. It was held that employment of persons to influence decisions in a proper way was not against sound public policy. It was further held that the means and methods used must be improper, or else such employment would be perfectly legitimate. (*Bergen* v. *Frisbie,* 125 Cal. 168, 57 Pac. 784.)

An agreement between attorney and client for professional services to be rendered by the former in collecting facts, preparing and submitting to the proper authorities of the United States government arguments upon the merits of those holding Indian lands purchased from the government for a reduction and upon the justice and advisability of such reduction of the purchase price of such lands, is valid and enforceable. (*Stroemer* v. *Van Orsdel,* 74 Neb. 132, 121 Am. St. Rep. 713, 4 L. R. A. (n. s.) 212, 103 N. W. 1053, 107 N. W. 125; see, also, *Houlton* v. *Nichol,* 93 Wis. 393, 57 Am. St. Rep. 928, 33 L. R. A. 166, 67 N. W. 715; *Obenchain* v. *Ransome-Crummey Co.,* 69 Or. 547, 138 Pac. 1079, 139 Pac. 920; *Haley* v. *Hollenback,* 53 Mont. 494, 165 Pac. 459; *Spaulding* v. *Maillet,* 57 Mont. 318, 188 Pac. 377; *Mulligan* v. *Smith,* 32 Colo. 404, 76 Pac. 1063.)

The power of courts to declare a contract void for being in contravention of sound public policy is a very delicate and undefined power, and like the power to declare a statute unconstitutional, should be exercised only in cases free from doubt. (*Cole* v. *Brown-Hurley Hardware Co.,* 139 Iowa, 487, 16 Ann. Cas. 846, 18 L. R. A. (n. s.) 1161, 1164, 117 N. W. 746.) There was no evidence tending to prove or establish the fact that the contract of employment between appellant and respondents contemplated such action as contravened sound public policy. If the evidence in the case raised a question of its illegality, then such question should have been submitted to the jury for its consideration. (*Obenchain* v. *Ransome-Crummey Co., supra; Mulligan* v. *Smith, supra; Chard* v. *Ryan-Parker etc. Co.,* 182 App. Div. 455, 169 N. Y. Supp. 622.)

*Messrs. Gunn, Rasch & Hall, Mr. M. J. Lamb* and *Messrs. Burkheimer & Burkheimer,* of the Bar of Seattle, Washington, submitted an original and a supplemental brief in behalf of Respondents Barth; *Mr. Carl Rasch* argued the cause orally.

Contracts which expressly or impliedly contemplate the employment of corrupt or otherwise improper methods to influence the official conduct of legislators or others charged with public duties, or the purpose of which is to secure the action of one of the parties thereto to influence and induce a third person, imposing confidence in such party and believing that he is disinterested, to do some act or thing from which the party exercising the influence or persuasion will receive some benefit or advantage unknown to the person whose action is thereby secured, are void as against public policy. (2 Elliott on Contracts, secs. 1040 *et seq.; Providence Tool Co.* v. *Morris,* 2 Wall. (U. S.) 45, 17 L. Ed. 868; *Hyland* v. *Oregon Hassan Paving Co.,* 74 Or. 1, Ann. Cas. 1916E, 941, L. R. A. 1915C, 823, 144 Pac. 1160; *Hazelton* v. *Sheckells,* 202 U. S. 71, 6 Ann. Cas. 217, 50 L. Ed. 939, 26 Sup. Ct. Rep. 567 [see, also, Rose's U. S. Notes]; *Chippewa Valley & S. Ry. Co.* v. *Chicago, St. P. M. & O. Ry. Co.,* 75 Wis. 224, 6 L. R. A. 601, 44 N. W. 17; *Houlton* v. *Dunn,* 60 Minn. 26, 51 Am. St. Rep. 493, 30 L. R. A. 737, 61 N. W. 898; *Hayward* v. *Nordberg Mfg. Co.,* 85 Fed. 4, 29 C. C. A. 438; *Torpey* v. *Murray,* 93 Minn. 482, 101 N. W. 609; *Simon* v. *Garlitz,* 63 Tex. Civ. 172, 133 S. W. 461; *Langdon* v. *Conlin,* 67 Neb. 243, 108 Am. St. Rep. 643, 60 L. R. A. 429, 93 N. W. 389; *Ridgely* v. *Keene,* 134 App. Div. 647, 119 N. Y. Supp. 451; *Alpers* v. *Hunt,* 86 Cal. 78, 21 Am. St. Rep. 17, 9 L. R. A. 483, 24 Pac. 846.)

Under section 4218, United States Compiled Statutes (3 Fed. Stats. Ann., 2d ed., 837), the bestowal of grazing privileges upon anyone within Indian reservations required affirmative and favorable action by three separate and distinct governmental agencies, to-wit: The Indians, speaking through their

council, the agent in charge of the reservation, and the sec-
retary of the interior. To incite the exercise of the authority
conferred, and the performance of duties imposed upon either
one or any of these governmental agencies, whose consent and
co-operation are required, by improper means, methods or in-
fluences, renders the transaction illegal and void, and subjects to
the penalties of a criminal offense the parties engaged in such
an undertaking. (*Sharp* v. *United States,* 138 Fed. 878, 71
C. C. A. 258.)

It is settled law in this country that agreements "to in-
fluence" legislation, although the legislation sought may be
clearly beneficial; agreements to use "personal influence, im-
portunity," bribery or corruption to obtain or "prevent"
legislation, and agreements to procure by bribery or "secret
influence" a government contract from an officer charged with
the letting or making of the same, are each and all against
public policy and void. (18 Corpus Juris, secs. 360, 368, 371;
*Oscanyan* v. *Winchester Repeating Arms Co.,* 103 U. S. 261,
26 L. Ed. 539 [see, also, Rose's U. S. Notes] ; *Weed* v. *Black,*
2 McAr. (9 D. C.) 268, 29 Am. Rep. 618; *Owens* v. *Wilkinson,*
20 App. Cas. (D. C.) 68.)

MR. JUSTICE HOLLOWAY delivered the opinion of the
court.

The plaintiff alleges in his complaint that between July 28,
1915, and October 15, 1917, he performed work and labor for
the defendants at their instance and request as a special agent
in procuring the cancellation and reletting of leases for range
purposes, in ousting incumbent lessees upon the Crow Indian
reservation, and in resisting cancellation of a lease held by the
defendant Charles McDaniels; that defendants promised and
agreed to pay him a reasonable sum commensurate with the
value of the services rendered, together with all expenses and
fees of assistants; that the services rendered were of the reason-
able value of $20,000, no part of which has been paid, although

defendants have from time to time paid his traveling and hotel expenses and charges of assistants.

The separate answer of each of the defendants is in effect a general denial of all the material allegations of the complaint. Each of the defendants admits that from time to time he advanced certain sums of money to the plaintiff, but as gratuities only.

Upon the trial, and at the conclusion of all the testimony, the court directed a verdict for the defendants, and judgment was entered thereon dismissing the complaint. From that judgment and from an order denying a new trial, plaintiff appealed. After the appeals were perfected defendant Barth died, and his personal representatives were substituted.

In 1915 three parcels of Indian lands on the Crow reservation were leased to stockmen for grazing purposes. Each of these parcels is designated by the corresponding number of the lease. Lease 3 covered about 300,000 acres, lease 4 about 400,000 acres, and lease 5 about 250,000 acres. It is not made certain who held leases 3 and 4, but lease 5 was held by F. M. Heinrich. All of these leases would expire in February, 1916, and it was the policy of the government to advertise for bids for new leases, some time in advance of the expiration of the old leases.

According to plaintiff's testimony, he was employed by McDaniels in 1915, and that employment was confirmed or a like employment made by Barth in 1916. Although the testimony given by the plaintiff in his case in chief covers 200 pages of the printed transcript, he does not anywhere undertake to tell what were the terms of his contract of employment. Each of the defendants denied that he ever employed plaintiff for any purpose whatever, so that, if the existence of the contract be conceded for the purpose of argument, its terms can be deduced only from what the plaintiff testified that he did in pursuance of it. He testified that he met McDaniels first at Crow Agency in July, 1915, about the time a general council of the Indians was to be held; that McDaniels represented that Heinrich was

overstocking the range and was not paying enough for lease 5, and that he (McDaniels) was able and willing to pay more, if plaintiff would use his influence to have Heinrich eliminated; that McDaniels solicited his assistance and agreed to pay him for the services rendered; that he accepted the employment and in pursuance thereof went among the Indians, talked with them about the matter, and spent $300 given to him by McDaniels in entertaining the Indians; that his employment contemplated that he should use his "influence at the council to get Heinrich eliminated," and the result was that the council voted that Heinrich should not again receive a lease for Indian lands. Plaintiff testified further that, when the new bids were received, Lee Simonsen was awarded leases 3 and 4, and Heinrich was the highest bidder for lease 5; that the government referred the Heinrich bid back to the Indians in council in November, 1915, for reconsideration, and again he went among the Indians and worked with them, spending $200 furnished by McDaniels for that purpose, in entertaining members of the tribe and giving money to some of the Indians outright. He was then asked: "Q. What was your purpose in giving this money to the Indians; what good did you feel it was going to do you? A. It would·have influence. Q. They would feel more kindly to you and your propositions you advanced? A. Yes, sir." He testified further that McDaniels told him what to say to the Indians, "to go right on and influence the Indians to be at the meeting, and, while the discussion was on, to protest against Heinrich's bid." The result of that meeting was that the council adhered to its former decision and refused to permit Heinrich to secure a lease, and lease 5 was awarded to McDaniels. Plaintiff testified: "I got him on No. 5, and I made it available with my influence and efforts." He testified further that McDaniels represented that Barth was backing him; that Barth wanted leases 3 and 4 and wanted Simonsen's leases canceled "because Simonsen violated his contract"; that about May, 1916, he (plaintiff) met Barth, and Barth then stated that he wanted to get leases 3 and 4, particularly 4; that

Simonsen had violated his contract; that it would be easy to
have the Indians pass a resolution calling for the cancellation
of the Simonsen leases, and that he (Barth) would then be able
to get what he wanted; that Barth stated further that he had
employed McDaniels to collect data; that he wanted plaintiff
to work for him "to secure Nos. 3 and 4"; and that, if he
(Barth) could get those leases for five years, he could make
a million dollars. Plaintiff testified further that soon there-
after he and another Indian, Frank Yarlott, went to Washing-
ton, D. C., and appeared before the senate committee on
Indian affairs and "had special legislation enacted that the
Crow Indians have general council without interference by the
government employees"; that he also sought and secured from
the senate committee an order for a delegation of Indians to
go to Washington to present their argument in favor of the
cancellation of Simonsen's leases; that, before he and Yarlott
started for Washington, he secured a letter of introduction
from Mr. Arthur, of Billings; and that Barth bought both
railroad tickets and gave to plaintiff $300. Asked by his coun-
sel what he did by way of carrying out his contract of employ-
ment, plaintiff testified that he devoted all of his time going
about over the reservation, visiting the different Indians, and
presenting to them Barth's contention that Simonsen was not
paying enough rental and was permitting Heinrich to run
cattle on 3 and 4, and that Barth would pay more if the Simon-
sen leases were canceled. Plaintiff was asked by his counsel,
"You may tell the jury whether you continued at that time to
use your influence among the Indians for the purpose of having
these Simonsen leases canceled," to which he replied, "Yes,
sir." He testified further that he secured the Indians to sign
and send to the Senate committee on Indian affairs a petition
for the cancellation of the Simonsen leases; that he personally
went to Washington after July 15, 1916, and that Barth paid
his expenses; and that later in the same year he went again to
Washington as a delegate selected by the Indians to appear
before the senate committee. Concerning this, he was asked

by his counsel, "What acts, if any, were done by either Barth or McDaniels in aiding you to be a delegate next time?" to which he replied, "Well, I, as usual—I entertained the Indians with the money furnished me by Mr. Barth or McDaniels; I visited the different parts of the reservation and carried out the purpose." He testified further that the Simonsen leases were canceled about September, 1916; that Dana and Long were thereafter awarded leases 3 and 4; and that immediately he went to work, under the direction of Barth, to secure the cancellation of the Dana-Long leases, upon the representation of Barth and McDaniels that the new lessees "stood in with Mr. Heinrich," and to that end he made a trip to Washington. He testified further that the McDaniels lease on No. 5 was for two years from February, 1916, with the option for three years additional if the Indians approved it; that soon after McDaniels went into possession under lease 5. he became involved in trouble over it and efforts were made to have the lease canceled; that a government inspector was sent to the reservation to investigate McDaniels' operations, and that he (plaintiff) spent some time checking up this government inspector while he was engaged in his work; that McDaniels desired to secure the extension of his lease; that at the solicitation of McDaniels and Barth he (plaintiff) worked among the Indians and with the Indian department to prevent the cancellation of the McDaniels lease; that he circulated a petition and secured the signatures of the Indians for the extension sought by McDaniels, forwarded this petition to Washington, and afterward made two trips there in that behalf; that on one of these trips other Indians went with him. He testified: "Through my influence or through my efforts they went to Washington with me to present the matter to the office." He testified further that the McDaniels lease was canceled in the summer of 1917 and McDaniels ordered off the reservation, but that, through his influence with the Indians, McDaniels was permitted to remain there for a considerable period of time. He testified: "Well, Mr. McDaniels failed to have his leases

extended, but if it wasn't for my efforts among the Indians he would have been ousted immediately, and he would have lost thousands and thousands of dollars." And again: "I did prevent him from being ousted at the time they wanted him off." He testified that during his employment he sent several telegrams to officials in Washington, and that Barth paid the expense of transmission in each instance; that upon one occasion, at the solicitation of Barth, he (plaintiff) procured Chief Plenty Coos to go to Billings and to sign and send a telegram to Commissioner Sells and one to Senator Ashurst; that Barth paid the expenses of transmission in each instance, and, in addition thereto, gave Plenty Coos $300. He testified that he never made any investigation as to the truth or falsity of the representations made to him by Barth or McDaniels, but accepted them as true, and that he concealed from the Indians and the officials at Washington, or at least did not disclose and was afraid to disclose to them or any of them that he was in the employment of these defendants.

The evidence of plaintiff shows that during about six months of the year 1917 McDaniels furnished to him $2730 and several hundred dollars during the two preceding years; that Barth also furnished several hundred dollars to him and directed him to call upon Mr. Arthur for money in case he (Barth) should be absent, and that he did call upon and receive money from Arthur many times. He testified that McDaniels deposited money in a bank at Hardin upon which he (plaintiff) was authorized to draw his checks; that he did not keep any memorandum of his expenses, and was not required to make any accounting. He testified that he used all of the money; that he paid railroad fare for Indians coming to and returning from council meetings, paid for their meals and other expenses; that upon one occasion he purchased for the Indians a complete baseball outfit at an expense of about $50. He was not able to account for all of the money by distinct items, but concerning it he said: "I know I have spent it with the Indians, given it to the Indians and for expenses." In his testimony he

accounts for more than $4,000 which he had received and refers to various other sums of which he could not give any account whatever.

Under an Act of Congress approved February 28, 1891 (26 [1] Stats. at Large, 795), lands owned by Indians and not needed for agricultural purposes may be leased ''by authority of the council speaking for such Indians, for a period not to exceed five years for grazing, or ten years for mining purposes in such quantities and upon such terms and conditions as the agent in charge of such reservation may recommend, subject to the approval of the secretary of the interior.'' (Sec. 3 (3 Fed. Stats. Ann., 2d ed., p. 837; U. S. Comp. Stats., sec. 4218.) From the language of this statute it appears reasonably certain that it was the legislative purpose to confer primary authority upon the Indians, and that the determination of the council should be conclusive upon the government, at least in the absence of any evidence of fraud or undue influence. This was understood by the parties, and particularly by the plaintiff, for he testified that no one could get a lease over the objections of the Indians.

If we assume for the purposes of this case that plaintiff was [2] employed by the defendants, the determinative question then arises: What were the terms of the contract of employment, or what was he employed to do? As we have observed heretofore, this question can be answered only by reference to the testimony concerning the things which he did. In the absence of any evidence to the contrary, we must conclude that whatever he did was within the scope of his employment; that he was employed to do just what he did do.

Measuring the terms of the contract by plaintiff's activities, we find: (1) He was employed to exert his influence with the Indians to prevent Heinrich receiving a lease of Indian lands and to augment his influence, by the expenditure of money furnished by McDaniels, in entertaining the Indians, paying their expenses, and courting their favorable consideration of the plan. (2) He was employed to distribute money (provided

[61 Mont. 322.]

by McDaniels) among the Indians for the purpose of influencing them and making them feel more kindly towards his proposition, which was that the Indians should adhere to their former resolution that Heinrich should be excluded from leasing, although he was the highest bidder. (3) He was employed to incite the Indians to demand the cancellation of Simonsen's leases, without reference to the merits of the case and solely upon the unverified statements of Barth and McDaniels. (4) He was employed to prevent the cancellation of McDaniels' lease independently of the fact that the government discovered just cause for canceling it. (5) He was employed to keep McDaniels on the reservation in defiance of the government's order, made after investigation, canceling the McDaniels lease and directing McDaniels to remove from the reservation. (6) He was employed to work for the cancellation of the Dana-Long leases upon the uninvestigated charges of Barth and McDaniels. No court of any civilized country will lend its aid to enforce contracts for the corrupt use of money to influence action on the part of those having favors to bestow or withhold, and it is altogether immaterial that the resulting action may not lead to injury or that it may be for the best interest of all parties concerned. The law looks to the evil tendency of such agreements and closes the door to temptation by refusing them recognition in any court.

Counsel for plaintiff cite and rely upon the case of *Obenchain* v. *Ransome-Crummey Co.*, 69 Or. 547, 138 Pac. 1078, 139 Pac. 920, but the decision furnishes no consolation for them. Obenchain sued to recover compensation for services in securing for the Ransome-Crummey Company contracts for street improvement in Medford and Klamath Falls, Oregon. It was developed upon the trial that he had expended over $200 in entertaining councilmen of the cities, purchasing for them liquor, theater tickets, *etc.* The court said: "Now, if the testimony shows that the defendant, when it hired plaintiff, contemplated or intended that he should expend money for such purposes, the contract of hiring was illegal and void, and, irrespective of

the condition of the pleadings, it would have been the duty of the court so to declare it and dismiss the case.'' The court found, however, that the ''expense money'' allowed to Obenchain was intended only to cover legitimate expenses, and that the use of money for the entertainment of public officials was not contemplated by the parties when the contract of employment was made. Cases, almost without number, could be cited in support of the views which we have indicated. It will suffice to refer to them as they are collated in the notes to sections 361–371, 13 Corpus Juris, pages 426–434.

Again, we need not stop to inquire whether the Indian council is technically an agency of the general government; for it follows from the fact that the council is vested primarily with the authority to determine who may and who may not lease Indian land, that anything done, the tendency of which is unlawfully to influence the determination of the council, must of necessity impair, obstruct, or defeat the proper functions of the government in supervising the interests of its wards, and any contract which looks to such purpose is condemned by every dictate of good morals and every principle of sound public policy, if, indeed, it does not evidence a criminal conspiracy within the purview of section 5440, United States Revised Statutes (7 Fed. Stats. Ann., 2d ed., p. 534; U. S. Comp. Stats., sec. 10201), as construed in *Haas* v. *Henkle*, 216 U. S. 462, 17 Ann. Cas. 1112, 54 L. Ed. 569, 30 Sup. Ct. Rep. 249 [see, also, Rose's U. S. Notes.]

From still another viewpoint the contract in question is void. [3] To appreciate fully the plaintiff's testimony, the situation of the parties at the time the agreement was made must be understood. Barth and McDaniels desired to secure leases upon Indian lands. They knew or were charged with knowledge that the approval of the Indians in council would receive recognition by the Interior Department, and therefore they desired above all things else to bring influence to bear upon the members of the tribe that would result favorably to them. White Bear was a citizen of the United States, educated at Carlisle,

[61 Mont. 322.]

where he attended school for practically four years, leaving only a few months before he would have graduated to enlist in the army. He was in the army for three years and saw service abroad in Cuba and Porto Rico. He is a grandson of a former head chief of the Crow Tribe, speaks the English language fluently, and understands it readily. He was an interpreter for the Indians, a regular attendant upon the council meetin. and prominent in all tribal affairs. To use his own language, he "was one of the spokesmen of the council." He had been before the department at Washington and before the congressional committee many times, was acquainted with the officials of the department and with senators, members of the committee on Indian Affairs; was well acquainted with the Indians and with conditions on the reservation. His influence with the members of the tribe is attested by the fact that he was generally successful in having his views adopted, even in the presence of pronounced opposition. Under these circumstances, there is not any room for doubt that it was his personal influence for which the defendants contracted primarily, that influence to be reinforced by corrupt use of money. For this additional reason the contract is void. (*Spaulding* v. *Maillet*, 57 Mont. 318, 188 Pac. 377.)

The trial court held that the contract violates the public policy of this state, and with that conclusion we agree. The judgment and order are affirmed.

*Affirmed.*

MR. CHIEF JUSTICE BRANTLY and ASSOCIATE JUSTICES COOPER and GALEN concur.

MR. JUSTICE REYNOLDS, being disqualified, takes no part in the foregoing decision.